UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| JESUS CASTELLANOS and RAQUEL CASTELLANO, | Case No.: 18cv2334 JM(AGS) |
| --- | --- |
| Plaintiffs, | **ORDER ON MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| UNITED STATES OF AMERICA, et al., | |
| Defendants. | |

Presently before the court is Defendants the United States of America and Michael Hedlund's motion for summary judgment (Doc. No. 32). A hearing on the motion was held on January 13, 2020. For the reasons set forth below, the motion is denied.

## I.     BACKGROUND

This lawsuit stems from an incident that occurred at the Calexico Port of Entry ("POE") on December 17, 2017. Upon applying for admission to the United States, Plaintiffs and their adult son, Marco, were referred to secondary inspection so that the vehicle they were traveling in could be inspected. (SAC at ¶ 17; Doc. No. 33-5, "Jesus Castellanos Dep.," 13[1]; Doc. No. 33-7, "Marco Castellanos Dep.," 5.) The Plaintiffs were sent to secondary inspection because a database had indicated to the primary inspector that

---

[1] Document numbers and page references are to those assigned by CM/ECF for the docket entry.

Marco was on supervised release in connection with a drug smuggling conviction. (SAC at ¶ 17; Doc. No. 33-4, Miguel Salcedo Decl. at ¶¶ 3, 4; Marco Castellanos Dep. 5.)

While Plaintiffs were being held in the secure secondary waiting area, California Border Patrol ("CBP") Canine Program Officers were conducting a "sensitive border security operation" referred to as a "canine block blitz" which involved inspecting all southbound vehicles and targeting a vehicle that was stopped directly across from Marco and Jesus Castellanos. (Doc. No. 33-9, "Eugene Stewart Dep.," 5, 8.) The entire incident within the secondary waiting area was videotaped, although an unobstructed and clear view of the encounters between Jesus Castellanos and all of the CBP Officers is not presented. Not surprisingly, the parties present differing accounts on certain aspects of the incident.

Marco began using his mobile phone, and as he was approached by CBP Officer Martinez, put his phone back in his pocket. (Jesus Castellanos Dep. 15[2]; Marco Castellanos Dep. 6-7; Eugene Stewart Dep. 5.) Officer Martinez and Marco exchanged words regarding Marco's use of the phone. (Jesus Castellanos Dep. 16; Marco Castellanos Dep. 8, 9; *see generally* Doc. No. 47-2, Ex. 4, Report of Investigation ("R.I.").) Officer Martinez believed Marco was recording what was occurring at secondary and told Marco that he needed Marco to hand over his phone. (*Id.*) Although Marco himself disputes that he ever stated he would not turn over his phone and simply requested a supervisor be called, others claim that Marco refused to give his cellphone to Officer Martinez. (*See* Jesus Castellanos Dep. 17; Marco Castellanos Dep. 9; Eugene Stewart Dep. 5-6; *see generally* R.I.)

Officer Martinez entered the secure waiting area and attempted to arrest Marco. Marco did not acquiesce to being handcuffed, telling Officer Martinez not to touch him. (Jesus Castellanos Dep. 17; Marco Castellanos Dep. 10.) Officer Garneau arrived to assist

---

[2] Plaintiffs included excerpts of the deposition transcript of Jesus Castellanos in support of their opposition, Doc. No. 40-3. For ease of reference the court has simply referred to the full transcript supplied by the Defendants, Doc. No. 33-5, and has changed the citations to the appropriate CM/ECF page number.

Officer Martinez in restraining Marco. At this point, Plaintiffs Jesus and Raquel Castellanos approached Marco and Officers Martinez and Garneau. Jesus Castellanos placed his right hand into the general vicinity where Officer Garneau and his son were standing. (Doc. No. 33-1 at 2, screenshot of surveillance video, 21:04:08.471.) Jesus Castellano maintains he was reaching to touch his son's arm while simultaneously telling him to calm down, and that all he was doing was trying to ease the tension. (Jesus Castellanos Dep. 18, 19.) Marco stated that he heard his father telling him "Calmate hijo," (relax son), while putting his hand on his shoulder. (Marco Castellanos Dep. 11.) In contrast, CBP Officer Hedlund claims he saw Jesus Castellano place his hand on Officer Garneau's left arm and interpreted this as an assault on his fellow officer, "[I]t's an absolute no-no in my book, I mean you don't touch an officer." (R.I. at 29; *see also id.* at 21.) Officer Garneau would later recount that Marco screamed and hollered the entire time, which caused his father to respond to the area who then screamed and hollered. (R.I. at 8.) The video image is not clear as to who Jesus Castellano is reaching for.

At this point, CBP Officer Pelayo reported that he moved over to the secondary inspection area and guided Jesus Castellanos back with his left hand, over the top of the fence that is securing the secondary waiting area. (R.I. at 7.) The video confirms this. Then Officer Hedlund entered the secondary area and moved directly toward Jesus Castellanos. He pushed Jesus Castellanos backward and away from the ruckus involving his son. (Doc. No. 33-1 at 3, screenshot of surveillance video, 21:04:16.545.) Officer Hedlund recounted that while pushing him backward, "Jesus Castellanos became physically assaultive toward him and began to grab and scratch CBPO Hedlund's face." (R.I. at 21.) Jesus Castellanos and Officer Hedlund disagree as to whether any verbal commands were issued by Officer Hedlund while he was pushing Jesus Castellanos backward.

Officer Hedlund then turned Jesus Castellanos toward the bench and sat him down. Jesus Castellanos' left hand/fist was up near the right side of Officer Hedlund's face. (Doc. No. 33-1 at 3, screenshot of surveillance video, 21:04:19.748.) Officer Hedlund later reported that Jesus Castellano had him "by his throat and began to hit him." (R.I. at 22.)

Officer Hedlund struck downward on Jesus Castellanos' left arm with his right arm. Jesus Castellanos maintained his grip on Officer Hedlund's uniform shirt. (Doc. No. 33-1 at 5, screenshot of surveillance video, 21:04:20.282; Doc. No. 33-1 at 6, screenshot of surveillance video, 21:04:20.416.) Officer Hedlund then punched Jesus Castellanos twice under the left arm in his upper left side, causing Jesus Castellanos to release his grasp of Officer Hedlund's uniform. The internal investigation report states that "Jesus Castellanos' right arm can be seen holding onto CBPO Hedlund's left arm." (R.I. at 3.) Jesus Castellanos claims that he may have touched Officer Hedlund when he was "moving my hand out of desperation that I am going to fall down" backward. (Jesus Castellanos Dep. 21.) This initial interaction lasted approximately 9 seconds.

Officer Hedlund then attempted to handcuff Jesus Castellanos by turning Jesus Castellanos to his right. CBP Officer Zaragoza arrived to help. The parties dispute whether Jesus Castellanos resisted being handcuffed. Plaintiff claims that he did not struggle or resist arrest. (Jesus Castellanos Dep. 22.) Defendant contends that the video shows "Jesus Castellano then positioned his left leg in an apparent attempt to stand up as the two CBP officers were trying to handcuff him in a seated position. The two CBP officers therefore turned Jesus Castellanos face down onto the bench to handcuff him." Doc. No. 33 at 13. (*See also* Doc. No. 33-1 at 7, screenshot of surveillance video, 21:04:26.955; Doc. No. 33-1 at 8, screenshot of surveillance video, 21:04:41.837.) Officers Garneau, Bustillo, Zaragoza and Guerrero reported that Jesus Castellanos was physically and verbally non-compliant. (R.I. at 8, 9, 10, 15.) The video illustrates that Jesus Castellanos ended up face down on the bench, with CBP Officer Guerrero also assisting in cuffing Jesus Castellanos. The image of Mr. Castellanos is obscured from view, but Plaintiff maintains that he was punched 6-7 times after the handcuffs were on him and his right arm was twisted. (Jesus Castellanos Dep. 23.) It takes approximately 32 seconds to place the handcuffs on Jesus Castellanos.

Afterward, Jesus Castellanos complained of right elbow pain and was transported to El Centro Regional Medical Center. An x-ray was negative for fracture of the elbow and

neither rib fractures or fractures of the pneumothorax were found. (Doc. No. 33-1 at 15, 22, 25, 26.) An X-ray of the elbow scan two days later showed no signs of fracture but were "suggestive of an occult fracture around the elbow joint" and a CT scan of the chest revealed "minimally displaced ribs." (*Id.* at 43-46.) No injuries to Jesus Castellanos' left arm were indicated. Jesus Castellanos suffers from diabetes and takes blood thinners. (Jesus Castellanos Dep. 3.)

On October 10, 2018, Plaintiffs filed suit in district court pursuant to 28 U.S.C. §§ 1331, 1346(B) and 1391(b) alleging that Defendants violated their civil rights and committed torts against them. (Doc. No. 1.) The Second Amended Complaint was filed on October 7, 2019, (Doc. No. 29), wherein Plaintiff Jesus Castellanos asserts two "Bivens claims" against Defendant Hedlund: (1) for Excessive Force in violation of his Fourth Amendment Right to be free from the use of excessive force and; (2) Unlawful Detention/False Arrest in violation of his Fourth Amendment Right to be free from unreasonable seizure and unlawful arrest. In addition, Jesus Castellanos brings claims against the United States pursuant to pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671 *et seq.,* for Assault, Battery, and False Imprisonment and both Plaintiffs assert claims for Negligence and Intentional Infliction of Emotional Distress under the Act. Plaintiff Jesus Castellanos also brings a Bane Act claim for violation of California Civil Code § 52.1.

## II.    LEGAL STANDARDS

A motion for summary judgment shall be granted where "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the initial burden of informing the court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). But Federal Rule of Civil Procedure 56 contains "no express or implied requirement . . . that the moving party support its motion with affidavits or other similar materials <u>negating</u> the opponent's claim." *Id.* (emphasis in original).

In response to a motion for summary judgment, the non-moving party cannot rest on the mere allegations or denials of a pleading but must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal citations omitted). In other words, the non-moving party may not rely solely on conclusory allegations unsupported by factual data. *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). The court must examine the evidence in the light most favorable to the nonmoving party, *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962), and any doubt as to the existence of an issue of material fact requires denial of the motion, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## III. DISCUSSION

The individual Defendant, Officer Hedlund, seeks summary judgment on Plaintiff Jesus Castellanos' *Bivens* claims.[3] First, Officer Hedlund argues that the *Bivens* Fourth Amendment claims should be dismissed as a matter of law because they would require an unwarranted extension of *Bivens* remedies. Second, Officer Hedlund seeks summary judgment under the qualified immunity doctrine asserting that Plaintiff has failed to prove a constitutional violation and, even if there is a constitutional violation, there is no existing precedent that squarely governs the specific facts at issue. Finally, the Government argues that the FTCA claims are precluded by the customs exception.

---

[3] Within the papers, the parties make references to "Plaintiffs' *Bivens* claims," but it is only Mr. Jesus Castellanos who has any *Bivens* claims currently before the court. (*See* SAC at ¶¶ 36-60.) Within the SAC, Mr. Castellanos brought two separate causes of action that were identified as *Bivens* claims, one for excessive force and one for unlawful detention/false arrest. (*See id.*) Therefore, the court will treat these causes of action as two independent claims, and refer to them as being brought solely by Mr. Castellanos.

## A.    "New Context" Under *Bivens* Cases

Officer Hedlund argues that the case currently before the court, which involves a canine U.S. Border Patrol officer responding to defend other officers while a special operation was underway, constitutes a new context with meaningful differences between it and the other *Bivens* cases decided by the Supreme Court.  (Doc. No. 33 at 16-17.)  The crux of Defendant's argument is that the court has to look at this case differently than a run-of-the-mill *Bivens* case because this happened at the international border.  Plaintiff counters that "a claim that Border Patrol agents used excessive force against United States citizens on U.S. soil is a "garden variety" *Bivens* claim, notwithstanding the fact the incident took place at a customs inspection site.  (*See* Doc. No. 40 at 18-27.)

In *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, the Supreme Court "recognized for the first time an implied private action for damages against federal officers alleged to have a violated a citizen's constitutional rights."  *Ashcroft v. Iqbal¸*556 U.S. 662, 675.  The Court held that a plaintiff could bring a damages action in federal court against individual federal officers for violating the Fourth Amendment. *Bivens,* 403 U.S. 388, 397 (1971).  *Bivens* has since been expanded to allow suits for violations of the Due Process Clause of the Fifth Amendment and for violations of the Eighth Amendment.  *See Davis v. Passman*, 442 U.S. 228, 99 (1979); *Carlson v. Green*, 446 U.S. 1468 (1980). [4]

---

[4] In *Bivens¸* the plaintiff whose apartment was entered by Federal Bureau of Narcotics Agents acting under claim of federal authority was arrested for alleged narcotics violations. *Bivens,* 403 U.S. 388. He then brought suit for damages for violation of his rights under the Fourth Amendment.  In *Davis v. Passman*, 442 U.S. 228 (1979), an administrative assistant sued a Congressman for firing her, and the Court determined that the Fifth Amendment Due Process Clause provided her with a monetary remedy for gender discrimination.  In *Carlson v. Green*, 446 U.S. 14 (1980), a prisoner's estate sued federal jailers for failure to treat the plaintiff's asthma, with the Court ruling that the Eighth Amendment's Cruel and Unusual Punishment Clause gave plaintiff a cause of action for damages for failure to provide medical treatment.

For only the fourth time, the Supreme Court recently considered the availability of a *Bivens* damages remedy in *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1857 (2017), noting that if the three *Bivens* cases were before the Court today they might be decided differently, and explaining that the Court has "consistently refused to extend *Bivens* to any new context or new category of defendants." The *Abassi* Court clarified (or perhaps established) the paradigmatic standard by with the validity of future *Bivens* claims should be considered "the proper test for determining whether a case presents a new *Bivens* context is as follows. If the case is different in a meaningful way from previous *Bivens* cases decided by this Court, then the context is new." *Abbasi,* 137 S. Ct. at 1859. The Court then provided some examples of what would constitute a new context explaining:

> A case might differ in a meaningful way because of the rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; the statutory or other legal mandate under which the officer was operating; the risk of disruptive intrusion by the Judiciary into the functioning of other branches; or the presence of potential special factors that previous *Bivens* cases did not consider.

*Id.* at 1860.

If the court determines that a claim presents a new context, then a second step, a special factors analysis, is required to see if the claim may proceed. Thus, the Court explained "[t]he Court's precedents now make clear that a *Bivens* remedy will not be available if there are "special factors counseling hesitation in the absence of affirmative action by Congress.'" *Id.* at 1857 (citations omitted). However, the Court acknowledged that although it had not defined what constitutes "special factors counseling hesitation" the inference can be made that the:

> Inquiry must concentrate on whether the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed. Thus, to be a "special factor

counseling hesitation," a factor must cause a court to hesitate before answering the question in the affirmative....[5]

In sum, if there are sound reasons to think Congress may doubt the efficacy or necessity of a damages remedy as part of the system for enforcing the law and correcting a wrong, the courts must refrain from creating the remedy in order to respect the role of Congress in determining the nature and extent of federal-court jurisdiction under Article III.

*Id.* at 1858.

Relatedly, the Court noted that if there was an alternative remedial structure present in a certain case, "that alone may limit the power of the Judiciary to infer a new *Bivens* cause of action. For if Congress had created 'any alternative, existing process for protecting the injured party's interest' that itself may 'amount to a convincing reason for the Judicial Branch to refrain from providing a new and freestanding remedy in damages.'" *Id.* (internal alterations and citations omitted.)

Within the opinion, the *Abbasi* Court emphasized that it was to be understood that it was not casting:

doubt on the continued force, or even the necessity, of *Bivens* in the search-and-seizure context in which it arose. *Bivens* does vindicate the Constitution by allowing some redress for injuries, and it provides instruction and guidance to federal law enforcement officers going forward. The settled law of *Bivens* in this common and recurrent sphere of law enforcement, and the undoubted reliance upon it as a fixed principle in the law, are powerful reasons to retain it in that sphere.

---

[5] The Supreme Court also explained that the decision to recognize a damages remedy requires an assessment of its impact on government operations systemwide. Those matters include the burdens on Government employees who are sued personally, as well as the projected costs and consequences to the Government itself when the tort and monetary liability mechanism of the legal system are used to bring about the proper formulation and implementation of public policies. These and other considerations may make it less probable that Congress would want the Judiciary to entertain a damages suit in a given case. *Abbasi,* 137 S. Ct. at 1858.

*Id.* at 1856-57.

Neither party questions the unassailable proposition that "Congress intended to afford customs officers great latitude in conducting a search at an international border crossing." *Klein v. U.S.*, 472 F.2d 847, 849 (9th Cir. 1973); *U.S. v. Thompson*, 282 F.3d 673, 678 (9th Cir. 2002) (the United States has a strong interest in protecting its borders…). They simply disagree as to whether, as Defendant suggests, the operations of U.S. Border Patrol officers constitute a new context that would discourage a court from authorizing a *Bivens* remedy.

The court must begin its inquiry by focusing on whether the claims presented are "different in a meaningful way from previous *Bivens* cases." Here, the present case has parallels to the Supreme Court's original *Bivens* case in that both are predicated on the Fourth Amendment. Plaintiff Jesus Castellanos seeks damages for the alleged use of excessive force and his unlawful detention/false arrest. But clearly, Border Patrol agents operate under different statutory and legal mandates than the FBI agents involved in the original *Bivens* case. There are also differences between immigration and customs enforcement issues at the border that are absent in traditional law enforcement contexts. And, importantly, the incident occurred at the secondary inspection site at the Calexico Port of Entry, on the international border where levels of force, detention and control are more readily employed, and reasonably so, than in a traditional law enforcement setting.

But the differences beg the question, however, as to whether they *fundamentally* differ from the standard law enforcement contact in which an individual is subject to physical force, detained, or otherwise controlled. Both border enforcement and traditional law enforcement are cabined by existing Constitutional standards. *See, e.g., U.S. v. Brignoni-Ponce,* 422 U.S. 873, 881-882 (1975) (concluding that Border Patrol agents on roving patrols may perform reasonable *Terry*-stops and "question the driver and passengers about their citizenship and immigration status, and he may ask them to explain suspicious circumstances, but any further detention or search must be based on consent or probable cause.") Whatever physical force to be employed must be reasonable under the

circumstances. *Saucier v. Katz,* 522 U.S 194, 207 (2001) ("Excessive force claims, like most other Fourth Amendment issues, are evaluated for objective reasonableness based upon the information officers had when the conduct occurred.") Standard border detention in secondary at the international border will no more excuse or justify excessive force than a traditional arrest for drunk driving or any other criminal wrongdoing. Whereas the search of a vehicle may be performed at the border without reasonable suspicion, it may not be conducted in a destructive manner. If reasonable suspicion exists for an intrusive vehicle search then greater measures, even destructive in nature, may be utilized either at the border or in traditional law enforcement. But the consistent standard for all of these applications of force, whether at the international border or otherwise, is the fundamental Constitutional mandate: reasonable force at all times and in all relevant contexts. On balance, the context in which force and seizure were employed against Plaintiff tips in favor of the court concluding the circumstances of this case do not comprise a new *Bivens* context. However, there is more to assess.

The court now turns to whether this case involves any "special factors" that would preclude a *Bivens* remedy. Plaintiff Jesus Castellanos seeks damages for the alleged use of excessive force and unlawful detention/false arrest. Officer Hedlund argues that the Ninth Circuit has broadly identified "immigration issues as necessarily creating a special factor counseling hesitation." (Doc. No. 33 at 18 quoting *Mirmehdi v. U.S.,* 689 F.3d 975, 982 (9th Cir. 2012)). Officer Hedlund also argues that officers like himself play a key role in preventing terrorism at our nation's border, as well as detecting and seizing controlled substances and other contraband, often used to finance terrorist and/or criminal drug trafficking organizations and that he was performing a specialist operation at the time of the incident. (Doc. No. 33 at 20.) It is Officer Hedlund's contention that case law supports his position that *Bivens* liability is not extended to contexts that involve defensive measures taken directly at the border nor to safety/security measures taken during inspections at ports of entry or airports. (*Id.* at 20-23.)

But, contrary to Defendant's assertion, the court does not view extending *Bivens* in this instance and the purported implications regarding national security concerns as a genuine special factor. As the *Abbasi* court cautioned, "national security concerns must not become a talisman used to ward off inconvenient claims." *Abbasi,* 137 S. Ct. at 1861. This court does not think Border Patrol officers will be deterred from responding adequately and without hesitation if faced with *Bivens* liability any more so than any other federal officer. *See Rodriguez v. Swartz*, 899 F.3d 719, 745 (9th Cir. 2018) ("Agents sued under *Bivens* are liable only when they violate a clearly established constitutional right, and the rules governing the use of lethal force are clearly established.")[6] There are numerous cases where Border Patrol officers have been sued for Fourth Amendment violations and the court sees no reason why this case, simply because it occurred at the border, implicates national security issues. *See e.g., Rodriguez*, 899 F.3d 719 (allowing a *Bivens* Fourth Amendment claim against a Border Patrol agent who shot and killed a teenage Mexican citizen walking down a street in Mexico); *Chavez v. U.S.*, 683 F.3d 1102, 1110 (9th Cir. 2012) ( a border patrol agent conducting a roving patrol near the border "violates the Fourth Amendment if she stops a vehicle in the absence of an objectively 'reasonable suspicion'…); *Morales v. Chadbourne*, 793 F.3d 208 (1st Cir. 2015) (*Bivens*

---

[6] Defendant's reliance on *Perez v. Diaz*, 331 F.Supp.3d 1101 (2017) and *Hernandez v. Mesa*, 885 F.3d 811 (5th Cir. 2018) in support of his position is misplaced. (Doc. No. 33 at 21.) *Perez* involved circumstances markedly different from those currently before the court and included the cross-border shooting of an illegal immigrant and challenged the policy of the U.S. Border Patrol. *Hernandez* is a case that included *Bivens* claims and involved a U.S. border patrol agent shooting a Mexican teenage boy on Mexican soil. The *Hernandez* court found that to allow a Bivens claim would interfere with the political branches' oversight of national security and foreign affairs, because allowing it to proceed would flout Congress' explicit refusal to provide a damages remedy for aliens injured abroad, and "create a remedy with uncertain limits. *Hernandez*, 885 F.3d at 822. In contrast, Plaintiff Jesus Castellanos is not challenging any policy, no illegal entry occurred, no cross-border shooting has taken place, no foreign citizens are involved, and Plaintiff has only sued the officer who allegedly assaulted him.

claim against ICE agent for wrongfully detaining a U.S. citizen); *Martinez-Aguerro v. Gonzalez*, 459 F.3d 618 (5th Cir. 2006) (recognizing Fourth Amendment Bivens claim against a border agent for excessive force and unreasonable arrest and detention).

Moreover, at the hearing, defense counsel acknowledged that Defendants were not arguing for a constitutional free zone at the border, and that if gratuitous force is used by an officer then national security cannot be considered as a factor because there is no nexus between gratuitous force and national security. Regardless of the nomenclature used, the issue of whether the force used by Officer Hedlund was gratuitous or excessive is a central issue in dispute. This provides yet another reason why national security is not a special factor here.

As to the remaining special factors, Plaintiff Jesus Castellanos is not challenging any high-level executive branch policies or policymakers, he has only sued the officer who allegedly assaulted him. Extending *Bivens* here would also not implicate foreign policy because the incident involved American citizens on American soil. And, although both Plaintiffs are bringing claims under the Federal Tort Claims Act, Jesus Castellanos' legal remedies against Officer Hedlund are limited to *Bivens* claims because "the Westfall Act is clear [] that the protection afforded federal employees for common law torts 'does not extend or apply to a civil action against an employee of the Government ... which is brought for a violation of the Constitution of the United States.' 28 U.S.C. § 2679(b)(2)(A)." *Rodriguez*, 899 at 740.

In light of the above, the court finds that this case is "therefore like the ones that *Abbasi* distinguished – those involving 'standard law enforcement operations' and individual instances of …law enforcement overreach." *Rodriguez*, 899 at 745 (citations omitted). Accordingly, the court concludes that Plaintiff may proceed with his *Bivens* claims.

## B. Qualified Immunity

The doctrine of qualified immunity shields government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or

constitutional rights of which a reasonable person would have known." *Wilson v. Lane,* 526 U.S. 603, 609 (1999) quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). In determining the applicability of the qualified immunity doctrine, the court conducts a two-part test to decide: (1) if the alleged facts show a violation of a constitutional right; and (2) whether the right at issue was clearly established at the time of defendant's alleged misconduct. *See Pearson v. Callahan*, 555 U.S. 223, 232 (2009); *Saucier*, 533 U.S. at 201. Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs,* 475 U.S. 335, 341 (1986).

Officer Hedlund argues that he is entitled to qualified immunity for both of Jesus Castellanos' *Bivens* claims under either step of the usual analysis performed by a court in cases of this type. (Doc. No.33 at 23-29.)

### *(1)* ***Excessive Force Claim***

In relation to the excessive force claim, Officer Hedlund asserts that there is no evidence of a constitutional tort and that Plaintiff cannot show that his Fourth Amendment rights were violated under existing precedent. (Doc. No.33 at 23.)

### *(i)* ***Constitutional Violation***

The Fourth Amendment protects individuals from unreasonable searches and seizures. It "requires police officers making an arrest to use only an amount of force that is objectively reasonable in light of the circumstances facing them." *Blankenhorn v. City of Orange*, 485 F.3d 463, 477 (9th Cir. 2007) (citing *Tennessee v. Garner*, 471 U.S. 1, 7-8 (1985)). The Supreme Court has acknowledged that "it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *Saucier,* 533 U.S. at 205. Notably, "[n]either tackling nor punching a suspect to make an arrest necessarily constitutes an excessive force claim." *Blankenhorn,* 485 F.3d at 477. (citation omitted.)

*Graham v. Connor*, 490 U.S. 386 (1986), established the framework under which excessive force claims under the Fourth Amendment are to be analyzed. Thus, to determine whether a use of force was objectively reasonable, courts must balance "the

nature and quality of the intrusion on the individual's Fourth Amendment interests" against "the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396. In doing so, the court pays careful attention to the facts and circumstances of the case, including (1) the severity of the crime at issue, (2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight. *Ames v. King County, Washington*, 846 F.3d 340, 348 (9th Cir. 2017) (citing *Graham*, 490 U.S. at 396). Next, the court balances "the gravity of the intrusion on the individual against the government's need for that intrusion to determine whether it was constitutionally reasonable." *Miller v. Clark Cnty.,* 304. F.3d. 959, 964 (9th Cir. 2003) (citations omitted). This determination of whether the steps taken by an officer were objectively reasonable must, however, be made "'from the perspective of a reasonable officer on the scene' and not 'with the 20/20 vision of hindsight.'" *Ames*, 846 F.3d at 348 (quoting *Graham*, 490 U.S. at 396).

Generally, excessive force claims are questions of fact for the jury. *Hervey v. Estes*, 65 F.3d 784, 791 (9th Cir. 1995). *See also Smith v. City of Hemet,* 394 F.3d 689, 701 (9th Cir. 2005) (If the evidence, reviewed in the light more favorable to [plaintiff], could support a finding of excessive force, then the defendants are not entitled to summary judgment.") The Ninth Circuit has made clear "because the excessive force inquiry nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, we have held on many occasions that summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly." *Smith,* 394 F.3d at 702. (internal citations and changes omitted).

Officer Hedlund does not dispute that he punched Jesus Castellanos two times in the left side before placing the handcuffs on him. (*See* Doc. No. 47; R.I. at 22, 29.) As a result of the blows, Jesus Castellanos alleges that he suffered multiple rib fractures. Plaintiff also claims that Officer Hedlund severely and violently twisted his arm during the altercation and that he suffered an occult fracture to his left elbow. Plaintiff also alleges that he sustained multiple blows to his torso after the handcuffs were secured. (Jesus Castellanos

Dep. 23.) Considering the evidence in the light most favorable to Jesus Castellanos, the type of force used was intermediate as physical blows were delivered and constituted a sufficiently serious intrusion upon Castellanos' liberty interests.[7] *See Davis v. City of L.A.,* 478 F.3d 1048, 1055 (9th Cir. 2007) (extreme force evidenced by slamming arrestee head-first against a wall, face first into another wall, before throwing him face-down onto floor, placing knee on his back, and finally punching him in the face); *Blankenhorn,* 485 F.3d at 480 (officer's punches in response to individual resisting arrest not necessarily a reasonable response). *Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1056 (9th Cir. 2003) (force employed was severe when two officers continued to press their weight on plaintiff's neck and torso as he lay handcuffed on the ground and begged for air). *But see Forrester v. City of San Diego,* 25 F.3d 804, 807 (9th Cir. 1994) (in comparison to claims of deadly force or physical blows, physical pressure administered on demonstrator's limbs in increasing degrees, resulting in pain, found to be reasonable).

When Defendant Hedlund first began pushing Plaintiff backward, Plaintiff was not being arrested. Rather the family was reentering the United States after a day trip to Mexico. The only reason the Castellanos family was detained in the secondary inspection waiting area was because Marco's name appeared on the database at primary as someone who was on supervised release for a drug smuggling conviction. Marco had documentation to prove that he had obtained authorization for the visit. Although Jesus Castellanos was handcuffed and later released without any formal charges being brought against him, his refusal to comply with the officers' orders and resistance may have provided a compelling basis for the use of force. However, resistance to arrest does not rise to the level of a serious offense under the *Graham* analysis. *See Young*, 655 F.3d at 1164–65 ("[W]hile

---

[7] *Cf. Young v. Cnty. of L.A.,* 655 F.3d 1156, 1162–63 (9th Cir.2011) ("Whatever such force [the use of pepper spray and two strikes with a baton] is ultimately labeled, there is no question that its use against an individual is a sufficiently serious intrusion upon liberty that it must be justified by a commensurately serious state interest.").

18cv2334 JM(AGS)

disobeying a peace officer's order certainly provides more justification for force than does a minor traffic offense, such conduct still constitutes only a non-violent misdemeanor offense that will tend to justify force in far fewer circumstances than more serious offenses, such as violent felonies."). Therefore, because Jesus Castellano was not involved in an underlying crime at the time of his arrest, the severity of the crime at issue is minimal at best.

Officer Hedlund contends that he pushed Jesus Castellanos backward in an attempt to remove him from the vicinity where Marco and the group of CBP Officers were engaged in an altercation. (R.I. at 21-22, 28.) Following the incident, Hedlund claimed he did this out of concern for the other officers' safety and for Plaintiff's safety after seeing Jesus Castellanos move toward his son and because he was physically grabbing officers and trying to pull them back off his son. (*Id.* at 22.) But such a statement standing alone is insufficient. *See, e.g., Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010) (citation omitted). ("A simple statement by an officer that he fears for his safety or the safety [of] others" will not suffice.). Officer Hedlund also claims he acted reasonably in responding with force against Jesus Castellanos when Plaintiff grabbed him by the collar of his uniform, and that the amount of force exercised was reasonable when Jesus Castellanos would not let go. (Doc. No. 33 at 24; R.I. at 22). The investigative report states that after explaining how he struck Jesus Castellano two or three times in the kidneys/rib area because Jesus' hands were at his throat and Jesus had begun to hit him, Officer Hedlund "said this caused Jesus Castellanos' role to change from dominator to a defensive role." (R.I. at 22; *see also id*. at 24, 26.) In contrast, Plaintiff asserts that when he was holding on to the shirt of Defendant Hedlund, he was simply trying to stop himself from falling backward over the bench and that he did not make any attempt to hit or punch Officer Hedlund. (Jesus Castellanos Dep. 21-22.) The video of the incident does not categorically prove one party's version of events or the other, and, it may be reasonably inferred, does not support Officer Hedlund's contention that Plaintiff Jesus Castellanos was making

18cv2334 JM(AGS)

aggressive movements toward Officer Hedlund or other officers.  Thus, whether Jesus Castellanos posed an immediate threat to the safety of officers or others is in question.

Additionally, there is contradictory evidence regarding whether Plaintiff Jesus Castellano was or was not resisting arrest.  While the video shows three CBP Officers securing handcuffs on Plaintiff Jesus Castellanos, he maintains that he was not resisting arrest and a clear view of the entire handcuffing procedure is not shown from the video footage.  (*See* Jesus Castellanos Dep. 20-23.)  Similarly, amongst the CBP Officers there are inconsistencies as to whether proper warnings were given, if those warnings were given in English or in Spanish, and if any officer told Jesus Castellanos that he was being arrested.  (*See generally* R.I.)  It is also worth noting that Plaintiff was secured within a caged area, thus making it unlikely that he was going to escape.  *See. e.g., S.B v. Cnty. of San Diego*, 864 F.3d 1010, 1013 (9th Cir. 2017) ("Other relevant factors include the availability of less intrusive alternatives to the force employed, whether proper warnings were given and whether it should have been apparent to officers that the person they used force against was emotionally disturbed.")  Therefore, the court finds that whether or not Jesus Castellanos was resisting arrest at the time Officer Hedlund punched him is in question.

In sum, there are a number of material facts in dispute that call into question whether the actions of Officer Hedlund were reasonable.   If a jury believes Jesus Castellanos' evidence and rejects Defendant's evidence and version of events, it could find that the events did not play out as Officer Hedlund suggests.  In light of all of the evidence and drawing all reasonable inferences in favor of the Plaintiff, a jury could find that Officer Hedlund's use of force was not objectively reasonable, and, therefore, violated Jesus Castellanos' Fourth Amendment right against excessive force.

### (ii)    *Clearly Established Right*

A government official's conduct violates a clearly established right when the "contours of [a] right [are] sufficiently clear that every reasonable official would have understood that what he is doing violates that right."  *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2083 (2011) (citation omitted); *see also City and Cnty. of S.F. v. Sheehan*, 135 S. Ct. 1765,

1774 (2015). That "is not to say that an official action is protected by qualified immunity unless the action in question has previously been held unlawful, but it is to say that in the light of the pre-existing law the unlawfulness must be apparent." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987) (internal citations omitted). "In other words, existing precedent must have placed the statutory or constitutional question beyond debate." *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012) (citation omitted).

That means the court must decide if the alleged violation of Jesus Castellanos' Fourth Amendment right against excessive force "was clearly established at the time of the officer's alleged misconduct." *C.V. by and through Villegas v. City of Anaheim*, 823 F.3d 1252, 1255 (9th Cir. 2016) (citations omitted). In the Fourth Amendment context, the clearly established inquiry is especially important and "must be undertaken in light of the specific context of the case, not as a broad proposition because it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *Mullenix v. Luna,* 136 S. Ct. 305, 308 (2015) (citations omitted). "General excessive force principles as set forth in *Graham* and *Garner*, are 'not inherently incapable of giving fair and clear warnings to officers,' but they "do not by themselves create clearly established law outside an obvious case.'" *S.B.,* 864 F.3d at 1015.

Officer Hedlund argues that there was no evidence or case law providing clear warning to him that the force used was excessive because he believed he was acting in self-defense. (Doc. No. 33 at 26-29.) In support, and as clarified at the hearing, Defendant relies on *Jackson v. City of Bremerton*, 268 F.3d 646 (9th Cir. 2001), *Jimenez v. City of Costa Mesa,* 174 Fed. App'x. 399, 403 (9th Cir. 2006) and *Saetrum v. Vogt,* 673 F. App'x 688 (9th Cir. 2016). But the court is not persuaded that these cases support Officer Hedlund's contention that his behavior was appropriate as the relevant facts are distinctly dissimilar.

In *Jackson*, the plaintiff was part of a group of individuals fighting with police in a public park. Plaintiff was sprayed with a chemical irritant, had a knee placed in her back

while handcuffs were being placed on her wrists, and was placed in a patrol car where the officer rolled up the windows and turned up the engine in the July heat. *Jackson*, 268 F.3d at 652. Subsequently, Jackson discovered she suffered a fractured finger. *Id.* at 650. Finding Jackson's own testimony belied her assertion that neither she, nor her friends or family had verbally or physically threatened the police officers in question, the Ninth Circuit concluded that the use of force was not excessive. *Id.* at 653. In *Jimenez*, the Ninth Circuit came to differing conclusions about what kinds of contact are found to be objectively unreasonable on the part of police officers. 174 Fed. App'x. 399. The Court of Appeals found: (1) it constitutional for an officer to give a single push to an individual who was leaning over him when he was trying to arrest a suspect; (2) it unconstitutional for the same officer to push an unarmed bystander standing 3-4 ft away who suffered severe injuries as a result; and (3) that although the five punches the officer administered to the individual being arrested could be viewed as unreasonable, the officer was entitled to qualified immunity. *Jimenez,* 174 Fed. Appx. at 402-403.[8] Finally, in *Saetrum,* the Ninth Circuit succinctly held that a hands-on takedown executed by a police officer that resulted in a concussion did not "violate clearly established law, explaining: "even assuming that the takedown involved an unreasonable application of force, the contours of the law were not sufficiently clear to put any reasonable officer on notice that tackling Saetrum would violate the Constitution." *Saetrum*, 673 Fed. App'x at 691.

Plaintiff, in turn, relies on *Fontana v. Haskin,* 262 F.3d 871, 880 (9th Cir. 2000) and *Blankenhorn v. City of Orange*, 485 F.3d 463, 480 (9th Cir. 2007). In *Blankenhorn,* the

---

[8] In doing so the Ninth Circuit explained "that because of plaintiff's initial resistance, lack of serious injury, and the fact that he was not yet handcuffed when punched and thus posed at least a minimal threat, "we cannot conclude that a reasonable officer would have had 'fair notice' under existing caselaw that 'the force employed was unlawful, and that any mistakes to the contrary would have been unreasonable." *Jimenez,* 174 Fed. Appx. at 403. (citation omitted).

court held that a jury could find the punching of plaintiff while he was on the ground unreasonable if plaintiff was not resisting arrest. *Blankenhorn*, 485 F.3d at 480. Further, the Ninth Circuit explained that *Graham's* holding had the effect of putting arresting officers on notice "that force is only justified when there is a need for force." *Id.* at 481. In *Fontana,* the Ninth Circuit made clear that "some bodily intrusions may be provably accidental or *de minimis* and thus constitutionally reasonable" while "gratuitous and completely unnecessary acts of violence by the police during a seizure violate the Fourth Amendment." *Fontana,* 262 F.3d at 880 (physical and sexual assault of an arrestee violates the Fourth Amendment).

Added to the cases cited by the parties, other Ninth Circuit case law reveals that passive or minor resistance to arrest alone does not constitute an immediate threat justifying the use of intermediate force. *See Smith,* 394 F.3d at 702 (finding an uncooperative arrestee who shouts expletives at officers and who refuses to follow officers' commands but who is not actively threatening or attacking others is not an immediate threat justifying the use of intermediate force in the form of pepper spray and a police dog); *Bryan,* 630 F.3d at 826–28 (finding an unarmed man engaging in erratic but nonviolent behavior and shouting expletives at officers from fifteen to twenty-five feet away does not constitute an immediate threat justifying the use of a stun gun during a traffic stop); *Mattos v. Agarano*, 661 F.3d 433, 448, 451 (9th Cir. 2013) (finding an unarmed woman inside a car who "stiffened her body and clutched her steering wheel to frustrate the officers' efforts to remove her from the car" did not present an immediate threat of flight and was not evading arrest that warranted being tasered three times in one minute; and holding the use of a taser on a woman standing between an officer and her abusive husband who extends her arm and touches a police officer while attempting to intervene to discourage officers from arresting him constituted excessive force because there was "no threat that either spouse ha[d] a weapon"); *Winterrowd v. Nelson*, 480 F.3d 1181, 1185 (9th Cir.2007) (finding that no reasonable officer could justify slamming the suspect against the hood of a car just because the suspect had made verbal objections to being pulled over and had a "belligerent

attitude," where the suspect claims he was neither threatening nor physically abusive, was not attempting to flee, posed no physical danger, and did not resist the officers).

Given that facts necessary to decide the issue of qualified immunity are in dispute and finding the circumstances of this case more analogous to those of *Blankenhorn* and the body of cases that established that the use of intermediate force against an uncompliant arrestee can be excessive, the court finds Officer Hedlund is not entitled to qualified immunity at this time.  Accordingly, the court **DENIES** Officer Hedlund's motion for summary judgment on the excessive force claim.

### *(2)    The False Arrest Claim*

As to the false arrest claim, Officer Hedlund disputes that an arrest ever took place "but in response to his false arrest claim, he contends that he had probable cause to arrest Jesus Castellanos, and probable cause is a complete defense to a false arrest claim under *Bivens.*"  (Doc. No.33 at 23.)

"[A] warrantless arrest by a law [enforcement] officer is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed."  *Devenpeck v. Alford,* 543 U.S. 146, 152 (2004).  "If an officer has probable cause to believe that an individual has committed even a minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender." *Atwater v. City of Lago Vista,* 532 U.S. 318, 354 (2001*)*.  To establish probable cause "[t]here must be some objective evidence which would allow a reasonable officer to deduce that a particular individual has committed or is in the process of committing a criminal offense." *McKenzie v. Lamb,* 738 F.2d 1005, 1008 (9th Cir. 1984).  "Probable cause exists where the facts and circumstances within the officers' knowledge and of which they had reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed by the person to be arrested." *Dunaway v. New York,* 442 U.S. 200, 209 n.9 (1977).

Officer Hedlund argues that he is entitled to qualified immunity as to Jesus Castellanos' false arrest claim because he had probable cause to arrest him under California

Penal Code section 148 for willfully resisting, delaying, or obstructing a public officer. (Doc. No. 33 at 24.)  In support of his position, he cites the videotape, claiming it is "conclusive evidence" of Jesus Castellanos' criminal conduct, in that it demonstrates that Mr. Castellanos was interfering and resisting.  (*Id.*)

But, as set forth above, the facts do not indisputably show that Plaintiff willfully resisted, delayed or obstructed a public officer.  Whether or not Jesus Castellanos assaulted Officer Garneau when Officer Hedlund became involved is in dispute and whether or not Officer Hedlund gave any verbal warnings to Jesus Castellanos before he began pushing him backward is also in dispute.  Jesus Castellanos maintains that no commands where given, that Officer Hedlund said nothing while he was pushing him backward and that he was talking to his son and trying to diffuse the situation and settle down his son.  (*See* Jesus Castellano Dep. 18, 19, 23; Marco Castellanos Dep. 11.)  In contrast, Officer Hedlund reported that "he gave commands to Jesus Castellanos in English and told him in Spanish 'Tome asiento' (Take a seat).  CBPO Hedlund said Jesus Castellanos was listening but did not comply with commands given and kept flailing his arms," and that he verbally commanded Jesus Castellanos to "back up."  (R.I. at 22, 28, Doc. No. 47.)  Officer Hedlund also reported not recalling any other specific commands he gave Jesus Castellanos.  (*Id.* at 28.)  The video does not capture what commands, if any, where given to Jesus Castellanos and there is no clear image of the precise interaction between him and Officer Garneau.

In sum, the statements of Jesus Castellanos directly contradict those of Officer Hedlund.  A reasonable jury could believe Jesus Castellanos' version of the facts and conclude that probable cause did not exist for the arrest.  Viewing the evidence in the light most favorable to Jesus Castellanos, the court concludes that there are there are triable issues of fact as to whether Officer Hedlund had probable cause to arrest Plaintiff for a violation of section 148(a).  Summary judgment on this claim is therefore not warranted. Furthermore, the court cannot find that Officer Hedlund's decision to arrest Jesus Castellanos was objectively reasonable or the result of a reasonable mistake.  *See Rosenbaum v. Washoe Cnty.*, 663 F.3d 1071, 1076 (9th Cir. 2011) ("An officer who makes

an arrest without probable cause, however, may still be entitled to qualified immunity if he reasonably *believed* there to have been probable cause.") Thus, Officer Hedlund is not entitled to qualified immunity on Jesus Castellanos' Fourth Amendment false arrest claim at this stage of the proceedings. *See Demuth v. Cty. of L.A.*, 798 F.3d 837, 839 (9th Cir. 2015) ("While the law must be unambiguous to overcome qualified immunity, that doesn't mean that every official action is protected ... unless the very action in question has previously been held unlawful. [O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances. This is especially true in the Fourth Amendment context, where the constitutional standard—reasonableness—is always a very fact-specific inquiry.") (internal citations and quotation marks omitted.) Accordingly, Officer Hedlund's motion for summary judgment on the false arrest claim is **DENIED**.

### C.    *FTCA Claims*

The Government claims that the Customs exception set forth in U.S. Code § 2680(c) applies to Plaintiffs' FTCA claims and, therefore, this court lacks subject matter jurisdiction. (Doc. No. 33 at 29-32.) Specifically, the Government asserts that the exception applies because Plaintiffs' claims arise from the detention and inspection of their vehicle and Officer Martinez's attempt to detain and inspect Marco's phone. Plaintiffs counter that this exception does not apply because their claims do not arise out of the inspection, seizure, or detention of goods. (Doc. No. 40 at 27-30.)

Section 28 U.S.C. 2680(c) of the FTCA bars:

> any claim arising in respect to the assessment or collection of any tax or customs duty, or the detention of any goods, merchandise, or other property by any officer of customs or excise or any other law enforcement officer.

28 U.S.C. 2680(c).

The Supreme Court has interpreted the statutory language of section 2680(c) to encompass "*all* injuries associated in any way with the 'detention' of goods," including claims for negligence." *Kosak v. U.S.*, 465 U.S. 844, 854 (1984) (emphasis added). However, "after §2680(c) was enacted, Congress added an amendment to § 2680(h),

permitting recovery for various intentional torts when committed by an 'investigative or law enforcement officer,' including the intentional inflection of emotional distress." *Gasho v. U.S.*, 39 F.3d 1420, 1433 (9th Cir. 1994) (quoting 28 U.S.C. § 2680(h)); *Sheehan v. U.S.*, 896 F.2d 1168, 1169, *amended on other grounds¸* 917 F.2d 424 (9th Cir. 1990)).

Section 2680(h) provides that the FTCA's waive of immunity does not apply to:

> Any claim arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights: *Provided,* That, with regard to acts or omissions of investigative or law enforcement officers of the United States Government, the provisions of this chapter and section 1346(b) of this title [i.e., the waiver of immunity] shall apply to any claim arising, on or after the date of the enactment of this proviso, out of assault, battery, false imprisonment, false arrest, abuse of process, or malicious prosecution. For the purpose of this subsection, "investigative or law enforcement officer" means any officer of the United States who is empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law.

28 U.S.C. § 2680(h).

Thus, the Ninth Circuit has stated that "§§ 2680(c) and 2680(h) must be interpreted in a manner that reconciles them, without doing violence to either." *Gasho*, 39 F.3d at 1433.

For a claim to be barred the government make first demonstrate that the custom agent's conduct falls within the scope of activities exempted in § 2680(c). *Gasho*, 39 F.3d at 1433. If the government successfully does this, then the claims are barred. "If the government fails to show that the tortious conduct is exempt, the plaintiff's claim is not barred, assuming the plaintiff demonstrates that an "investigative or law enforcement officer" committed the intentional tort." *Id.*

At the time of the incident, Plaintiffs were away from their vehicle and the ensuing confrontation stemmed from Plaintiffs' son's use of a cell phone in the secondary inspection waiting area. When Marco did not immediately comply with Officer Martinez's demand to turn over the cell phone the situation escalated. However, the alleged assault on Jesus Castellano occurred while border patrol officers were in the process of detaining

him, a person, and had nothing to do with the inspection of the family's vehicle. "The Customs exception in § 2680(c) does not bar an intentional tort claim arising out of arrests by Customs agents, as the exception applies only to the detention of goods and merchandise, not persons." *Gasho,* 39 F.3d at 1434. *See also Kosak*, 465 U.S. at 856 ("the person who almost certainly drafted the language upon consideration clearly thought that it covered injury to detained property caused by the negligence of customs officials," and the provision covered claims "arising out of" the designated conduct.) Thus, the government has not met its burden of demonstrating that at the time of alleged tortious conduct, Officer Hedlund's actions were, in fact, related to the seizure and detention of goods by Customs.[9] Therefore, the Government's motion for summary judgment on the FTCA claims is **DENIED**.

## IV. CONCLUSION

For the reasons set forth above, Defendants' motion for summary judgment (Doc. No. 33) is **DENIED**.

IT IS SO ORDERED.

 Dated:  February 10, 2020

_____
Hon. Jeffrey T. Miller
United States District Judge

---

[9] In so finding, the court has declined to broadly read the Customs exception to apply to all actions tangentially related to a customs agent's official duties thereby insulating the Government from liability. *See, e.g., Snyder & Assocs. Acquisitions LLC, v. U.S.,* 859 F.3d 1152, 1159 (9th Cir. 2017) (noting that although Section 2680(c) has expansive reach it did not give the IRS absolute immunity, concluding: "Section 2680(c)'s exception to the waiver of sovereign immunity is broad, but it is not unlimited, and the government's all-encompassing view of it cannot be squared with the statutory text. By its terms, the exception shields only actions taken in connection with efforts to assess or to collect taxes, which were not involved in this case.").